**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| **ROGER BURKE** | ) | |
| | ) | |
| **Plaintiff-Claimant,** | ) | |
| | ) | **No. 11 C 50001** |
| **v.** | ) | |
| | ) | **Iain D. Johnston** |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant-Respondent.** | ) | |


**MEMORANDUM OPINION AND ORDER**

Claimant Roger Burke (hereinafter, "Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying Claimant's application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before the Court on cross-motions for summary judgment [Dkt. #25, 27].

Claimant argues that the Commissioner's decision denying his application for DIB should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth more fully below, Claimant's motion for summary judgment [Dkt. # 25] is granted in part and denied in part, and the Commissioner's motion is denied. The Commissioner's decision is reversed, and this matter is remanded to the Social

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

Security Administration ("SSA") for further proceedings consistent with this Memorandum

Opinion and Order. On the present record, this Court declines to remand with an order to award

benefits.

# I. BACKGROUND

*A. Procedural History*

Since 1981, Claimant has filed multiple claims for DIB and/or supplemental security

income ("SSI"). Claimant first filed a claim for DIB and SSI in 1981, which was denied in 1982.

R. 89-97. Claimant filed three subsequent DIB claims, which were denied in 1999, 2000, and

2002. R. 345.

On March 4, 2004, Claimant filed the claim at issue in this appeal for DIB due to a

disabling condition.[2] R. 104-106. Claimant initially alleged an onset date of January 1, 1999. R.

104. The SSA denied that claim first on March 9, 2005 and upon reconsideration on June 16,

2005. R. 59, 68. Claimant timely filed a request for hearing before an ALJ. R. 72. Following a

hearing before ALJ Janice Bruning at which the Claimant testified, the ALJ affirmed the SSA

decision denying the claim on September 11, 2006. R. 18-26. Specifically, the ALJ found that

Claimant was not precluded from performing past relevant work given his residual functional

capacity ("RFC"), that Claimant's job skills were transferable to other jobs that would

accommodate his RFC, and that a significant number of jobs existed in the national economy that

---

[2] The administrative record is not clear about the exact filing date of the claim at issue in this appeal. In their respective briefs, the parties refer to the claim as being filed on February 15, 2004. The 2006 ALJ opinion also refers to a claim dated February 15, 2004. R. 18, 343. In contrast, the transcript from the 2006 ALJ hearing refers to a claim dated October 15, 2004. R. 303. The transcript from the 2010 ALJ supplemental hearing and the 2010 ALJ opinion at issue in this appeal both refer to Claimant's application for DIB filed on February 20, 2004. R. 522. The administrative record includes two claims field in 2004: one filed on March 4, 2004 (but signed by Claimant on March 10, 2004), and another unsigned application filed on October 15, 2004. R. 104-110. Accordingly, the Court recognizes that the filing date of the claim at issue in this appeal is March 4, 2004.

Claimant could perform. R. 20-22. The Appeals Council denied Claimant's Request for Review on October 26, 2007 and Claimant filed a lawsuit in the Northern District of Illinois, Western Division seeking review. R. 11, 383.

On August 21, 2009, Magistrate Judge P. Michael Mahoney issued an opinion reversing the ALJ and remanding the case for further proceedings because the ALJ's RFC determination was not supported by substantial evidence in the record, the ALJ failed to sufficiently articulate her reasoning to establish a logical bridge from substantial evidence in the record to her RFC determination, and the ALJ misinterpreted part of the vocational expert's testimony regarding the Claimant's past work history. R. 359-63. Despite remanding the case for further proceedings, Judge Mahoney noted that there may be sufficient evidence in the record to support the ALJ's RFC determination. R. 361.

Following remand, ALJ Bruning conducted a supplemental hearing on June 22, 2010. R. 520. Claimant also attended the second hearing and testified. R. 522. On October 26, 2010, the ALJ issued a decision again denying the claim for benefits. R. 335. Claimant did not file exceptions with the Appeals Council and the Appeals Council did not otherwise assume jurisdiction, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.984(d) (2011). Claimant subsequently filed this appeal pursuant to 42 U.S.C. § 405(g). Claimant's objections to the ALJ's decision are limited to her RFC and credibility determinations. Accordingly, the Court will focus on the facts in the record related to those findings.

## *B. Hearing Testimony*

### 1. Roger Burke - Claimant

Counsel represented the Claimant at his supplemental hearing on June 22, 2010. R. 520. Claimant was born on May 6, 1947, making him 57 years old when his insured status expired on September 30, 2004, and 63 years old at his supplemental hearing before the ALJ on June 22, 2010. R. 104. Claimant completed high school and three years of college, concentrating in landscape design architecture. R. 523-524. At the time of his hearing, Claimant lived alone in a 132-year-old house. R. 524, 533. Claimant claims disability since January 1, 2000 due to an ulcerated left heel.[3] R. 525.

At the hearing, Claimant discussed the residual injuries from an automobile accident in 1965 when was 17 years old, which he claims led to his disability. Claimant stated that the left heel ulcer first developed following the accident. R. 320. Claimant indicated that the left heel ulcer had healed, but was reopened in 1994 because of an injury at work. R. 320, 538. Claimant stated that he had difficulty walking and was out of work for approximately five months after the heel ulcer reopened. R. 320.

Claimant was insured for benefits under the Social Security Act through September 30, 2004. R. 525. Claimant had no reported income after January 1, 2000. R. 525. Claimant worked full-time as a service representative at Farm and Fleet from 1992 to 1995 and was paid $8.25 per hour for his services. R. 194, 307. As a service representative, Claimant performed the functions of an automotive mechanic, including changing tires, repairing exhaust systems, and replacing batteries, lights, shocks, and struts. R. 194. Following a work-related injury that reopened his left foot ulcer in 1995, Claimant was out of work for 5 months. R. 307.

When Claimant returned to Farm and Fleet, he worked as a service clerk at the tire desk from 1995 through 1999. R. 309. Claimant worked approximately 15 to 20 hours per week as a

---

[3] Claimant first alleged an onset date of January 1, 1999. R. 104. At the supplemental hearing, Claimant amended his onset date to January 1, 2000. R. 525.

service clerk, performing customer service, stocking, and inventory functions, and was paid $8.10 for his services. R. 195. Additionally, Claimant testified that he "volunteered" on and off at a foster shelter for abandoned dogs, cats and farm animals from 1999 through 2006. R. 309-10. He worked approximately 20 hours per week at the shelter cleaning barns, doing odds and ends, feeding the animals, and working in the vegetable garden. R. 309-310, 536. Claimant received food and the owner of the shelter paid Claimant's property taxes in return for his services at the shelter. R. 310, 536-37.

Since leaving work at Farm and Fleet, Claimant stated he stays around the house during a typical day. R. 533. Claimant reported that he can stand for approximately an hour before needing to sit, and can sit for a little longer than an hour. R. 527. He testified that he has to stand up after an hour of sitting because his leg goes numb. R. 527. Claimant testified that he tries to restrict himself to three or four hours per day standing, but that life is demanding. R. 537. If he stands on his feet the entire day or more he would risk stressing his leg, ankle, and heel and he would get a fire sensation in his pelvic area. R. 538.

Claimant reported that he tries to stay active during the day. R. 535. Claimant testified that he performs household chores daily for an hour or so at a time, including cooking meals, washing dishes by hand, doing laundry, making his bed, cleaning the house, and taking out the garbage. R. 531. He testified that he rests for about a half an hour in between chores. R. 323, 540. Claimant stated that he performs some household maintenance and repairs as well, such as painting windows, mowing the lawn using a riding lawnmower, and shoveling snow. R. 319, 539. Claimant also cares for his indoor/outdoor dog. R. 532. Claimant also spends his time sitting or lying down, reading books, listening to the radio, or looking at the internet. R. 531-532. Claimant reported that he had difficulty navigating the interior stairs in his two-story home due

to his foot ulcer and went upstairs only a couple of times per week. R. 528. Finally, Claimant stated that he drove his car approximately two or three times per week and shopped on his own. R. 316, 530.

Claimant testified that he can walk a block or two, but would need to rest after walking that distance because of pain in his heel. R.40. Claimant testified that he had used a cane in 1995 when his heel was to a point that he could not put any weight on it, but that he did not currently use a cane. R. 529, 538. Claimant testified that he can sleep only if he lays on his side and that he takes half hour naps a few times a week. R. 530. Claimant also testified that if he "steps on the corner of a rug it hits that nerve" in his left heel and it feels like an electric shock, which causes him to fall down. R. 311.

Claimant testified at the first hearing in 2006 that he can lift 10 to 15 pounds. R. 312. Claimant testified at the 2010 supplemental hearing that he can lift 10 pounds. Claimant testified that while he can take care of his personal needs, he has to move slowly because he frequently loses his balance and falls down. R. 315, 530.

### 2. Vocational Expert ("VE") – Melissa Benjamin

At the supplemental hearing, the VE testified that Claimant's past relevant work as a sales clerk (service clerk) would be considered light exertion and semi-skilled work. R. 542. Claimant's past job as an auto tech (service representative) would be considered medium exertion and at the low end of semi-skilled work. R. 542. The VE also testified that none of the skills for these positions were transferable to sedentary. R. 542.

The ALJ posed the following hypothetical to the VE. R. 542. First, the hypothetical claimant who can lift and carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk a total of six hours during an eight-hour workday. R. 542. Second, the hypothetical claimant can

never climb ladders, ropes, or scaffolding. R. 542. Third, the hypothetical claimant can occasionally climb ramps and stairs and crouch and crawl. R. 542. Fourth, the hypothetical claimant can frequently balance, stoop, and kneel. R. 542.

The VE opined that the hypothetical person would not be able to perform any of Claimant's past relevant work as an auto tech (service representative). R. 542. However, she also testified that the hypothetical person would be able to perform Claimant's past relevant work as a sales clerk and that the hypothetical person could also perform packer, assembler, or sorter positions. R. 542. The packer, assembler, and sorter positions are all light and unskilled. R. 543.

The ALJ then modified the hypothetical person to include that he would require a sit/stand option allowing the person to sit for two minutes after standing for one hour. R. 543. The VE responded that requiring such a sit/stand option would reduce the available packer, assembler and sorter jobs by fifty percent and eliminate the sales clerk position. R. 543.

## C. *Medical Evidence*

Claimant was struck by a drunk driver in 1965 and sustained substantial injuries. R. 231. Claimant's physician, Dr. Jose Diaz, diagnosed Claimant with a fractured pelvis, dislocated left sacroiliac, possible sciatic nerve damage, fractured left tibia and fibula, severe laceration to the perineal region and open fracture of the skull with brain injury. R. 231.

On September 12, 1997, Dr. John Karesh, an internal medicine specialist at Dryer Medical Clinic in Aurora, Illinois, examined Claimant. R. 238. This examination occurred approximately two years after Claimant's work related injury that reopened the heel ulcer in 1995. Dr. Karesh noted that he did not see a specific ulcer on Claimant's left heel, but he did see

a callus formation. R. 283. Dr. Karesh also noted that further treatment of the heel ulcer would be of no use at that time. R. 238.

Claimant saw Dr. Karesh again on December 30, 1997. R. 237.  Dr. Karesh noted that Claimant's heal ulcer appeared to be healed without drainage but with chronic callus formation which required Claimant to wear a special silicone pad to prevent boot irritation. R. 237. Claimant saw Dr. Karesh again on August 26, 1998 and December 9, 1998. R. 234.  Dr. Karesh did not note any issues with Claimant's heel ulcer during those visits. R. 234.

From August 1998 through February 2002, Claimant was treated by a podiatrist, Dr. Levin, four times.  On August 20, 1998, Claimant saw a Dr. Levin for a chronic trophic ulceration on his left heel. R. 264.  Dr. Levin noted that while Claimant's ulcer seemed to be improving in the surrounding skin area, there was still fragile eschar[4] present centrally that was not breaking down. R. 264.  Dr. Levin noted that Claimant was working 20 hours per week at the time. R. 264.  Dr. Levin did not recommend that Claimant return to work full time, but instead he could return to work on a more limited basis. R. 264.

Claimant saw Dr. J. F. Lacart on September 8, 1998. R. 260.  Dr. Lacart referred Claimant to Dryer Medical Clinic for a leg measurement and shoe lift. R. 260. Claimant went to Dreyer Medical Clinic on September 15, 1998 and reported an ulcerated heel, skull fracture, drop foot, and loss of feeling in left leg at times with loss of control. R. 258.  The therapists at Dryer ordered him an orthotic leg lift. R. 259.

On December 23, 1998, Claimant saw Dr. Levin again. R. 264.  Dr. Levin noted that Claimant reported that he was working 20 hours a week at Farm and Fleet, but also was working

---

[4] Eschar is defined as a "thick, coagulated crust or slough which develops following a thermal burn or chemical or physical cauterization of the skin." STEDMAN'S MEDICAL DICTIONARY 597 (26th ed. 1995).

a side job which caused heel irritation. R. 264.  Dr. Levin also noted that there was no ulceration

on the left heel but the eschar was slightly moist at the lateral aspect.  R. 264.  Dr. Levin ordered

Claimant a new silo pad and noted that Claimant was putting utter balm[5] on the ulceration. R.

264.

Claimant did not return to Dr. Levin for over two years. R. 264.  Dr. Levin dispensed silo

pads and/or filled out and submitted disability forms on Claimant's behalf four times during that

time period. R. 264.  Claimant saw Dr. Levin on February 14, 2000. R. 264.  Dr. Levin noted that

Claimant had been working approximately 15 hours per week at an animal shelter and that the

previous left heel ulceration was the healthiest he had seen it look in a long time. R. 264.  There

was no eschar and the skin appeared dry with no suspect areas. R. 264. Dr. Levin followed this

appointment with a letter for Claimant's employer on February 22, 2000. R. 264.

Dr. Levin saw Claimant on February 14, 2002 for a heel evaluation. R. 264.  Dr. Levin

noted that the ulceration on the posterior aspect of his left heel was not open at that time, but that

there was fragile eschar which is disturbed by extended periods of weigh bearing and walking. R.

264.  Dr. Levin again proscribed a silo pad heel sock and indicated that Claimant would continue

applying utter cream to his heel. R. 264.  Claimant did not see Dr. Levin until after his insured

period expired in 2004. R. 264.

---

[5] The Court believes that the records are referring to an over-the-counter salve used for soothing
and moisturizing dry and cracked skin, which is sold under the names "udder balm" and "bag balm".  The
gooey, yellow-green ointment made of petrolatum, lanolin and an antiseptic 8-hydroxyquinoline sulfate
was invented by a Wells River druggist in 1899.  It was originally used to sooth irritation on cows' udders
after milking.  However, farmers' wives quickly realized how smooth it made the farmers' hands and
began employing the cream for other purposes.  The salve has a myriad of uses, including, but not limited
to, "squeaky bed springs, psoriasis, dry facial skin, cracked fingers, burns, zits, diaper rash, saddle sores,
sunburn, pruned trees, rifles, shell casings, bed sores and radiation burns." *See* John Curran, *Bag Balm:
Problem-salving for all*, USA TODAY, Jan. 31, 2010, *available at*
http://usatoday30.usatoday.com/news/nation/2010-01-31-bagbalm_N.htm.

Claimant saw Dr. Algimantas Kerpe on May 2, 2002. R. 245. Dr. Kerpe noted that Claimant reported that he had a recurrent ulcer on left heel and that he exercised by splitting wood for about 15 to 20 minutes a day. R. 245.

Claimant was seen by Dr. R. R. Grayson on July 9, 2002 for a formal internal medicine diagnostic consultation and report. R. 247. Dr. Grayson noted that claimant stated he had a chronic ulcer on the back of his left heel, which was not open or ulcerated the time of the examination. R. 247. Dr. Grayson noted that Claimant's left leg was remarkable in that the left calf was obviously atrophied on casual inspection and was two inches smaller in circumference than his right calf. R. 248. Dr. Grayson also noted the strength of Claimant's lower leg was normal on the right at 5/5 and weaker on the left at 3/5, and that Claimant's range of motion of all joints was within normal limits. R. 248.

On July 18, 2002, Dr. Paul LaFata completed a residual functional capacity assessment of Claimant. R. 249. Dr. LaFata indicated that Claimant could lift 20 pounds occasionally, and 10 pounds frequently. R. 250. Claimant could stand or walk about 6 hours in an 8 hour workday and was not limited in his ability to push or pull. R. 250. Claimant could frequently balance, stoop, and kneel, occasionally climb ramps and stairs, crouch and crawl, and could never climb ladders, ropes or scaffolds. R. 251. Dr. LaFata also noted that Claimant did not have any manipulative, visual, communicative, or environmental limitations and has a normal gait. R. 250, 252-253.

Claimant returned to Dr. Kerpe on May 29, 2003 complaining of a left heel ulcer. R. 274. Dr. Kerpe's exam of Claimant's left heel revealed slight weakness with dorsiflexion, inability to stand on both heels equally, and a scab on the left heel which was dry and appeared healed. R. 274. His assessment concluded that Claimant had a healed ulcer on his left heel. R. 274. Dr.

Kerpe offered to refer Claimant to orthopedics or neurosurgery for further evaluation, but Claimant declined the referrals because he did not have insurance. R. 274. Dr. Kerpe indicated that he felt he could not offer Claimant anymore treatment. R. 274.

Claimant had an internal medicine consultative examination with Dr. Roopa Karri on April 27, 2004. Dr. Karri noted that Claimant complained of left ankle soreness and giving out when working, pain in the left heel since he was 17, and falling down the stairs. R. 276. Dr. Karri's examination of Claimant noted scars on his left heel and leg and a blackish scar on his left heel with dried blood on it, a surgical scar that did not heal. R. 276. He also indicated that Claimant did not have any trophic changes, varicosities or ulcerations in his extremities. R. 277.

On May 13, 2004, Dr. Julio Pardo completed a residual functional capacity assessment of Claimant. R. 279 - 286. Dr. Pardo indicated that Claimant could lift 50 pounds occasionally, and 25 pounds frequently. R. 280. Claimant could stand or walk about 6 hours in an 8 hour workday and was not limited in his ability to push or pull. R. 280. Dr. Pardo noted that Claimant did not have any postural, manipulative, visual, communicative, or environmental limitations. R. 281 - 285. Dr. Pardo acknowledged that Claimant alleged disability, in part, due to an ulcerated heel. R. 286. Dr. Pardo noted that Claimant had a non-antalgic (normal) gait and was able to walk 50 feet without support. R. 286. Although Dr. Pardo noted that Claimant had some tenderness in his right shoulder and left tibia, he did not indicate whether there was a left heel ulcer present. R. 286. Following his RFC assessment with Dr. Pardo, Claimant did not see any additional treaters during his insured period, which expired on September 30, 2004. R. 337.

Claimant visited Dr. Levin again on December 16, 2004. R. 299. Dr. Levin noted that Claimant's ulcer has been "status quo" but that he has not been able to work much or the area

deteriorates. R. 299.  Dr. Levin noted that there was eschar present, but no acute ulceration. R. 299.  He prescribed a silo pad. R. 299.

Dr. Karri met with Claimant and performed a second internal medicine consultative examination on January 4, 2005. R. 289.  Dr. Karri indicated that Claimant had severe hip pain at night, which got worse with work and caused him to drag his left leg. R. 289. Dr. Karri's examination of Claimant noted a left posterior heel scar 2-cm by 1-cm which has healed completely, but that the scar had a scab on it. R. 290, 292. He also indicated that Claimant did not have any ulcerations in his extremities, but that Claimant did have atrophy of the left calf. R. 291.

Claimant last saw Dr. Levin on July 14, 2006. R. 299. Claimant reported that the ulcer occasionally drained. R. 299.  Dr. Levin indicated that the ulcer was dry and "status quo" and that Claimant had no acute problems at that time. R. 299.

Finally, Claimant produced two additional pieces of medical evidence that were not available at his 2006 hearing. First, Claimant produced an opinion letter dated May 28, 2010 from his retained expert, Dr. Julian Freeman.  Dr. Freeman did not treat Claimant.   After reviewing Claimant's medical records, Dr. Freeman opined that Claimant had a recurrent left heel ulcer resulting from venous and lymphatic obstruction from his accident in 1966, a left leg discrepancy, sensory loss from hemiparesis[6], and peripheral nerve damage. R. 516.  Dr. Freeman explained that the medical records "describe **frequently recurrent ulceration of the left heel** which never has evidenced a full and complete and stable closure on any examination." R. 516. Although the ulcer is usually closed upon inspection, no exam indicates that there is an "old" and fully solidified scar. R. 516.  Dr. Freeman also noted that Claimant likely had left hemiparesis,

---

[6] Hemiparesis is defined as "weakness affecting one side of the body." STEDMAN'S MEDICAL DICTIONARY 775 (26th ed. 1995).

but that the medical data was contradictory as to that issue. R. 515.  Dr. Freeman opined that

Claimant's left heel ulcer limited him to not more than sedentary work. R. 515.

Based on the medical evidence that he reviewed, Dr. Freeman opined that Claimant's

best anticipated level of function since 2002 was standing or walking two to three hours a day in

ten to fifteen minute periods, with walking limited to about a block at a time. R. 517. Dr.

Freeman indicated that Claimant could lift, carry, push, and pull 20 pounds occasionally, 10

pounds frequently, but predominately in a seated position. R. 517.  Claimant could rarely use left

foot controls and could not walk on rough, uneven terrain or participate in activities on scaffolds

or at unprotected heights. R. 517. Dr. Freeman also noted that Claimant does not have any

limitations in postural changes or any other environmental restrictions. R. 517.

Second, Dr. Levin provided Claimant with a letter dated June 1, 2010.  R. 466.  In his

letter, Dr. Levin opined that Claimant has a stable left heel ulceration with soft tissue loss at the

posterior aspect of his left heel.  R. 466. Dr. Levin explains that the ulcer was difficult to heal

and that Claimant was not able to ambulate excessively without reopening the ulceration. R. 466.

Dr. Levin further notes that Claimant has a pre-tibial edema[7], induration[8], and the skin was thin

and shiny. R. 466.  Dr. Levin opined that "at this time I believe [Claimant] can work in a sitting

capacity but in no way is there to be a walking/standing job…" R. 466.  Any job requiring

standing or walking would risk tissue breakdown, reopening the ulceration, and problems with

his lower leg. R. 466.

### D. The ALJ's Decision – October 26, 2010

---

[7] Edema is "an accumulation of an excessive amount of watery fluid in cells, tissues, or serious cavities." STEDMAN'S MEDICAL DICTIONARY 544 (26th ed. 1995).

[8] Induration is defined as "the process of becoming extremely firm or hard, or having such physical features." STEDMAN'S MEDICAL DICTIONARY 866 (26th ed. 1995).

Following the June 22, 2010 supplemental hearing and a review of the medical evidence, the ALJ found that Claimant was not disabled under the Social Security Act.  R. 339.  In making this determination, the ALJ analyzed Claimant's application under the required five-step sequential analysis.  R. 336-343.  The ALJ first found that the Claimant met the insured status requirements of the Social Security Act through September 30, 2004. R. 337.  At step one, the ALJ found that Claimant had not engaged in substantial gainful activity at any time material to the decision. R. 337.  At step two, the ALJ determined that the medical evidence established that Claimant had the following medically severe impairments: left heel ulceration and residuals of a motor vehicle accident at age 17, in combination. R. 337

At step three, the ALJ concluded that, even in combination, Claimant's impairments did not meet or medically equal the criteria of any listing in the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 337–338.  At step four, the ALJ determined that Claimant had the residual functional capacity ("RFC") to perform light work with certain limitations, and that he could perform his past relevant work as a sales clerk.  R. 338-342.  Specifically, the ALJ found that Claimant's RFC included light work with "no climbing of ladders, ropes, or scaffolding; frecuent balancing, stooping, and kneeling; and occasional climbing of ramps/stairs, crouching, and crawling."  R. 338-339.  With respect to this finding, the ALJ specifically refused to give Dr. Levin's opinion any weight because he expressed an opinion as to Claimant's functional capacity as of 2010. R. 341.  Likewise, the ALJ refused to give Dr. Freeman's opinion any weight because he "was a physician hired by claimant's attorney and is not a treating source…was hired to assist the attorney to get the claimant benefits...[and] acknowledged contradictions and discrepancies in the record."  R. 341.  Because the ALJ found Claimant capable of performing his past relevant work, the ALJ concluded that Claimant was not disabled under the Social

Security Act and therefore denied his application for DIB.  R. 341-342.  In the alternative, at step

five, the ALJ found that there were a significant number of jobs in the national economy that

Claimant could perform. R. 342.

## II. LEGAL STANDARD

### A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision

of the [Commissioner], with or without remanding the cause for a rehearing.  42 U.S.C. §405(g).

This much is clear regarding the standard of review.  If supported by substantial evidence, the

Commissioner's factual findings are conclusive. 42 U.S.C. §405(g).  If the Appeals Council

denies a request for review, the ALJ's decision becomes the Commissioner's final decision,

reviewable by the district court.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).  But beyond these

axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is

narrow.  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The

district court's review is limited to determining whether substantial evidence supports the

Commissioner's decision and whether the Commissioner applied the correct legal standard in

reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*,

237 F.3d 788, 792 (7th Cir. 2001).  Substantial evidence exists if there is enough relevant record

evidence that would allow a reasonable mind to determine that the decision's conclusion is

supportable.  *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971).  Accordingly, the reviewing

court cannot displace the decision by reconsidering facts or evidence, or by making independent

credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Indeed, on

review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v.*

*Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004).  Moreover, a decision need not provide a complete

written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362

(7th Cir. 2013).  If reasonable minds could differ concerning whether a claimant is disabled, then

the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful

to emphasize that the review is not merely a rubber stamp.  *Scott v. Barnhart*, 297 F.3d 589, 593

(7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.*  Moreover, a

reviewing court must conduct a critical review of the evidence before affirming the

Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the

Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the

court must remand the matter.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even

when adequate record evidence exists to support the Commissioner's decision, the decision will

not be affirmed if the Commissioner does not build an accurate and logical bridge from the

evidence to the conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[9]  And, unlike

most civil litigation in which a decision can be affirmed on any basis in the record, federal courts

cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir.

2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision

on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421

F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record").  Therefore, the

---

[9] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012).  Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge:  "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

**B. Disability Standard**

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past

relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

### A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for four (4) reasons. Claimant argues that the ALJ improperly evaluated Claimant's RFC because she 1) improperly rejected the 2010 opinions of Dr. Levin and Dr. Freeman, 2) did not adopt a contrary medical opinion, and 3) failed to include a narrative discussion describing how the evidence supports each conclusion. Claimant also argues that the ALJ's credibility assessment was improper.

The Commissioner contends that the ALJ's RFC determination and credibility assessment were proper and supported by substantial evidence in the record.

### B. Analysis

Claimant argues, and the Court agrees, that the ALJ's RFC determination was improper. However, the Court finds that the ALJ's credibility assessment was proper.

A claimant's RFC must be based upon the medical evidence and other evidence in the record, such as the claimant's testimony. 20 C.F.R. § 404.1545(a)(3). In making his RFC determination, the ALJ must decide which treating and examining doctors' opinions should receive weight, determine how much weight should be given to each opinion, and explain the reasons for that finding. 20 C.F.R. § 404.1527(d), (f). Additionally, the ALJ's RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions,

and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96–8p

As explained below, the ALJ made three errors in determining Claimant's RFC. First, the ALJ erred in rejecting Dr. Freeman's opinion. Second, the ALJ failed to build a logical bridge between the substantial evidence in the record and her RFC determination. Third, the ALJ failed to include a proper narrative discussion.

However, although the ALJ's RFC determination was flawed, her credibility assessment was proper. The credibility determination must include "specific reasons for the finding on credibility, supported by the evidence in the record, and must be sufficiently specific..." *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). The ALJ's credibility determination was properly supported by evidence in the record and was sufficiently specific.

**1. Medical Opinions of Dr. Levin and Dr. Freeman**

Claimant first argues that the ALJ erred in determining the Claimant's RFC by rejecting the 2010 opinion evidence produced by Dr. Levin and Dr. Freeman. Claimant argues that the ALJ erred in rejecting Dr. Levin's June 1, 2010 opinion because the ALJ did not consider the 20 C.F.R. § 404.1527(d) factors, including 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) supportability; 4) consistency; and 5) the specialization of the physician. Claimant points out that Dr. Levin was a specialist in podiatric medicine, he had a 13-year treatment relationship with Claimant, he treated Claimant nine times between August 20, 1998 and February 14, 2002, and he noted Claimant's ulcer in his treatment notes. The Commissioner responded that the ALJ properly rejected Dr. Levin's opinion because he expressed an opinion as to Claimant's functional capacity as of 2010, six years after the date last insured. In his 2010 letter, Dr. Levin

opined that due to Claimant's heel ulceration, he was constricted to sedentary work "***[a]t this time***". R. 466. (emphasis added).

Claimant's argument regarding Dr. Levin's 2010 opinion misses the issue. The ALJ properly declined to give Dr. Levin's 2010 letter any weight because it discusses Claimant's condition as of 2010, more than 6 years after the date last insured. An opinion of a treating physician that a claimant is disabled after the date last insured is not relevant to the determination of disability insurance benefits. *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987) (the opinions of treating physicians that the claimant was disabled after the date last insured were not relevant to her physical condition prior to the expiration of her insured status); *Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008) (medical evidence from after the date last insured is not relevant to the determination of disability benefits).

Claimant next argues that the ALJ erred in rejecting Dr. Freeman's opinion. The ALJ rejected Dr. Freeman's opinion because 1) he was hired by the Claimant's attorney to get benefits; 2) he was not a treating source; 3) he acknowledged "contradictions and discrepancies" in the record; and 4) he expressed an opinion as to Claimant's functional capacity as of 2010, six years after the date last insured.[10] Claimant argues that Dr. Freeman properly reviewed Claimant's medical evidence from the insured period and determined that as of 2002, Claimant had the residual functional capacity for no more than sedentary work. Additionally, Claimant argues that it is improper to reject evidence on the basis that it is provided by an expert hired by

_____

[10] Although Claimant did not challenge the fourth reason for rejecting Dr. Freeman's opinion, the Commissioner admitted that the ALJ mischaracterized Dr. Freeman's opinion when she found that it was as of 2010 and not 2002. The Commissioner argued that the mistake was harmless error. Because this issue was not raised by Claimant, the Court will not address it. *Bollas v. Astrue*, 694 F. Supp. 2d 978, 990 (N.D. Ill. 2010) ("Issues not raised in a claimant's initial brief are generally waived for purposes of review.")

the Claimant. Finally, Claimant argues that the "contradictions and discrepancies" acknowledged by Dr. Freeman relate to whether the Claimant suffered from hemiparesis during the relevant period, not whether the Claimant had a recurrent left heel ulcer. The Commissioner counters that the ALJ properly declined to give Dr. Freeman's opinion any weight because he was not a treating source.

Unlike the ALJ's treatment of Dr. Levin's opinion, her rejection of Dr. Freeman's opinion was not sound. Although an ALJ is not bound by the opinions of medical experts such as Dr. Freeman, the regulations require an ALJ to consider them. *See Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005). The ALJ must evaluate expert opinions "in the context of the expert's medical specialty and expertise, supporting evidence in the record, and other explanations regarding the opinion." *See Id. citing* 20 C.F.R. §§ 404.1527(f)(2); 416.927(f)(2). Here, the ALJ did not provide "good reasons" to discount Dr. Freeman's opinion because she did not point to any specific medical evidence that was inconsistent with his opinion. *See e.g. Zblewski v. Astrue*, 302 F. App'x 488, 493 (7th Cir. 2008) (ALJ properly discounted claimant's expert by pointing out contradictory medical evidence).

The Court recognizes that the record contains evidence that may be inconsistent with Dr. Freeman's opinion. For example, in February 2000, Dr. Levin reported that there was no eschar or suspect areas present on Claimant's left heel. R. 264. Dr. Grayson noted in July 2002 that although Claimant reported a left heel ulcer, it was not open or ulcerated at the time of the examination. R. 247. In May 2003, Dr. Kerpe's assessment concluded that Claimant had a healed ulcer on his left heel and that he could not offer Claimant any more treatment. R. 274. Dr. Karri's first consultative examination in April 2004 indicated that Claimant did not have any ulcerations in his extremities. R. 277. And the RFC assessments performed by Dr. LaFata and

Dr. Pardo indicate that Claimant had a normal gait. R. 294, 286. The ALJ erred by failing to provide these types of examples to discredit Dr. Freeman's opinion. *See Zblewski v. Astrue*, 302 Fed. Appx. 488, 493 (7th Cir. 2008) (ALJ properly discounted opinion offered by claimant's medical expert because the opinion was inconsistent with other substantial evidence in the record); *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) ("[A]n ALJ is required to determine the weight a nontreating physician's opinion deserves by examining how well [the nontreating physician] supported and explained his opinion, whether his opinion is consistent with the record, whether [the nontreating physician] is a specialist in pain disorders, and any other factor of which the ALJ is aware.")

Additionally, the ALJ mischaracterized Dr. Freeman's acknowledgment of "discrepancies" in the record. The discrepancies referred to by Dr. Freeman related to whether Claimant had *hemiparesis*, not whether Claimant had a *recurrent left heel ulcer*. Therefore, a major basis for not crediting Dr. Freeman's opinion was erroneous.

For these reasons, the Court finds that the ALJ erred in rejecting Dr. Freeman's opinion.

## 2. Independent Medical Conclusion

Claimant next argues that the ALJ erred by not adopting a contrary medical opinion after she rejected Dr. Levin's and Dr. Freeman's opinions. Claimant argues that the ALJ only provided three bases for her RFC determination, including: 1) Claimant had normal gait and ambulation, without assistance and with normal range of motion in all joints; 2) Claimant's lack of aggressive treatment, pain medication, and need for hospitalization; and 3) Claimant's activities of daily living. The Commissioner argues that the ALJ properly considered Dr. Pardo's 2004 opinion, which assessed functional limitations consistent with medium work. The Commissioner further argues that the ALJ's RFC determination was even more generous than

Dr. LaFata's 2002 and Dr. Pardo's 2004 RFC determinations because she adopted a more restrictive RFC (light work only with more restrictions than suggested by Dr. LaFata and Dr. Pardo).

In reaching her RFC conclusion, the ALJ identified certain medical evidence, including the treatment records from Dr. Levin and the consultative evaluations performed by Dr. Grayson and Dr. Karri. R. 340. The ALJ also made a passing reference to Dr. Pardo's 2004 RFC opinion, which concluded that the "Claimant had a residual functional capacity for medium work." R. 340. Then, the ALJ explained in conclusory fashion that "in sum" the RFC is supported by 1) the medical record; 2) findings of normal gait/ambulation; 3) lack of aggressive treatment, need for hospitalization; or pain medication; and 4) and the Claimant's activities, including taking care of his 130-year-old two-story house, painting, snow removal, mowing the lawn, tending to household chores, taking out the garbage, working as a handyman through 2006, driving, planting trees in containers and giving them to people, reading, using a computer, and watching documentaries.

Although the ALJ identified some medical records that support the RFC determination, the ALJ erred by failing to explain *how* those records support the determination. The ALJ must explain her reasoning in reaching the RFC, building a so-called "logical bridge" that connects the evidence and her decision. *Smith v. Astrue*, 467 F. App'x 507, 510-11 (7th Cir. 2012). The ALJ cannot simply cite some medical evidence; she must explain how that medical evidence supports her RFC determination. *Id*.

Here, the ALJ only made a cursory reference to Dr. Pardo's 2004 RFC Assessment by stating "[t]he DDS state agency physician opined in May 2004 that the claimant had a residual functional capacity for medium work." R. 340. The ALJ did not explain that Dr. Pardo

examined Claimant and acknowledged that his alleged disability was due in part to an ulcerated heel, or that he determined that the Claimant could lift 50 pounds occasionally, 25 pounds frequently, could stand or walk about 6 hours in an 8 hour workday, was not limited in his ability to push or pull, and had no postural, manipulative, visual, communicative or environmental limitations. R. 280 - 283.  Moreover, the ALJ failed to cite Dr. LaFata's 2002 RFC assessment of Claimant, even though that assessment was more restrictive than Dr. Pardo's assessment.[11]  Dr. LaFata's opined that Claimant could lift 20 pounds occasionally, 10 pounds frequently, could stand or walk about 6 hours in an 8 hour workday and is not limited in his ability to push or pull, and could frequently balance, stoop, and kneel, occasionally climb ramps and stairs, crouch and crawl, and could never climb ladders, ropes or scaffolds. R. 250.

In addition to the 2002 and 2004 RFC assessment, the Court recognizes that other significant evidence in the record may support the ALJ's RFC determination.  As explained in Section A above, several of the medical records indicate that the Claimant's ulcer was "healed" or "not ulcerated".  *See e.g.* R. 247, 274, 277.  And Claimant's own testimony that he worked on a farm approximately 20 hours per week through 2006 may provide strong support for the ALJ's RFC determination.  The ALJ erred by failing to cite this evidence and by not adequately explaining how this evidence, and other substantial evidence in the record, supported her RFC. *Smith*, 467 F. App'x at 511.  Moreover, other evidence contained in the record that supports the RFC and cited in the Commissioner's brief cannot be used now to seek affirmance on appeal. *See Parker*, 597 F.3d at 925

---

[11] Indeed, the Court notes that the marked improvement from the 2002 RFC, which determined the Claimant had the capacity for light work, and the 2004 RFC, which determined the Claimant had the RFC for medium work with no significant restrictions, would further support the ALJ's RFC determination.

On remand, the Court anticipates that the ALJ will consider all of the evidence described above when revisiting the issue of Claimant's RFC.

### 3. Narrative Discussion Requirement

Next, the ALJ erred by failing to include a narrative discussion of her conclusions. The ALJ's RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions, and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96–8p at *7 ("RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts."). The omission of a narrative discussion is sufficient to warrant reversal of the ALJ's decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (reversing for ALJ's failure to explain how he determined RFC limitations).

Here, the ALJ cited some medical evidence in the record and summarily concluded that "in sum" the evidence supports her RFC determination. As explained above, although the ALJ cited some medical evidence, she did not explain *how* it supported her RFC determination that Claimant was capable of light work with certain restrictions. She did not explain which evidence was given what weight and why. By simply reciting some evidence in the record without more, the ALJ "did not sufficiently articulate his *assessment* of the evidence…" and thus failed to include the required narrative discussion. *Mireles v. Astrue*, 2012 WL 1520712, *6 (N.D. Ill. 2012).

Additionally, as described above, the ALJ failed to properly discredit Dr. Freeman's opinion, which was contrary to her RFC determination. The ALJ determined that Claimant's RFC included light work with "no climbing of ladders, ropes, or scaffolding; frecuent balancing, stooping, and kneeling; and occasional climbing of ramps/stairs, crouching, and crawling." R.

338-339.  However, Dr. Freeman's opinion restricted walking to about a block at a time in 5 to 10 minute intervals and no walking on rough or uneven terrain.  R. 517.  The ALJ erred by not explaining why she did not adopt Dr. Freeman's opinion.

The Commissioner attempted to bolster the ALJ's limited analysis by arguing that Dr. Pardo's 2004 RFC assessment and Dr. LaFata's 2002 RFC assessment support the ALJ's RFC determination.  However, whatever the strength of this evidence, the ALJ did not rely on it in reaching her conclusion.  Although these RFC assessments clearly support the ALJ's RFC determination, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

### 4. Credibility

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility finding will not be overturned as long as it has some support in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1178-1179 (7th Cir. 2001).  Although the ALJ is not required to explain every factor in making a credibility determination, her opinion "must contain specific reasons for the finding on credibility, supported by the evidence in the record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and reasons for the weight."  *Brindisi*, 315 F.3d at 787-88.

The ALJ did not find Claimant's testimony credible.  The ALJ explained that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with her RFC assessment.  R. 339.  In support of her credibility finding, the ALJ noted that there was very little medical

evidence from the relevant period. R. 340.  The ALJ cited Dr. Karesh's December 1, 1999 report

that the Claimant had a healed ulcer and Dr. Levin's notes indicating that the ulcer was healthy

and healed in 2000. R. 340.  Additionally, the ALJ argued that the Claimant did not require pain

medication and did not pursue aggressive treatment of his ulcer or hospitalization, which

suggested that the symptoms were less restrictive than alleged. R. 341.  The ALJ also referenced

Claimant's daily activities and his volunteer work gardening and fixing things for an elderly

woman, although he did not analyze them thoroughly.  R. 340.  The ALJ considered Dr.

Grayson's and Dr. Karri's consultative evaluations, including that the Claimant had a normal

gait. R. 340.  The ALJ found that Claimant's alleged degree of limitation was inconsistent with

those medical findings.  *Id*.

SSR 96-7p provides that an ALJ must consider certain factors when evaluating

credibility.  As stated above, the ALJ considered the 96-7p factors, which include treatment

history, daily activities, symptoms, and medication.  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir.

2009).  The ALJ examined the factors and properly analyzed Claimant's credibility.  Contrary to

Claimant's assertions, the ALJ properly indicated that there was a lack of treatment records

during the relevant time period.  Claimant himself mischaracterized the strength of his own

medical evidence by claiming that he was seen by his treating podiatrist nine times between

August 20, 1998 and February 14, 2002.  Although Dr. Levin treated Claimant for 13 years, he

only treated Claimant sporadically during that time.  Despite Claimant's calculations to the

contrary, Dr. Levin only treated Claimant four times from August 20, 1998 through February 14,

2002. R. 264.  The other five notations on his medical records during that time period were for

dispensing silo pads, filling out disability forms, and writing a letter for his work. R. 264.  Dr.

Levin saw Claimant only two more times, on December 16, 2004 and July 14, 2006, after his insured period had passed. R. 299.

Claimant also argues that the ALJ erred by drawing a negative inference from the lack of medical records without considering any explanations, including Claimant's inability to pay for medical care. "In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citing SSR 96–7p). The ALJ, however, "must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.* An "inability to afford treatment" can provide insight to a claimant's lack of medical care. *Id.*

Here, the ALJ noted that Claimant claimed disability starting in 1999, yet he only sporadically sought medical treatment from his onset date through the expiration of his insured status. R. 341. The ALJ did not mention Claimant's testimony that he could not afford medical care or Dr. Kerpe's records that indicated Claimant declined referrals to specialists because he did not have medical insurance. However, "where the ALJ has made errors reversal is not required if no reasonable trier of fact could have come to a different conclusion." *Pulli v. Astrue*, 643 F. Supp. 2d 1062, 1073-74 (N.D. Ill. 2009) (denying remand despite ALJ failing to consider alternative explanation for lack of medical treatment). The ALJ found that Claimant's lack of medical treatment was one of several factors impacting the credibility determination, including most persuasively that Claimant continued to work as a "handyman" doing gardening and fixing things through 2006. R. 341.

Although the ALJ may not have provided as much analysis as Claimant would have liked, and her credibility determination was not flawless, it also was not patently wrong.  *See Simila*, 573 F.3d at 517.

## IV. CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied.  This case is remanded to the SSA for further proceedings consistent with the Memorandum Opinion and Order.

It is so ordered.

Date: September 17, 2013          By: _____
                                      Iain D. Johnston
                                      U.S. Magistrate Judge